## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

    v.

OLDEN MINNICK and
TERRANCE STANBACK,

        Defendants.

Criminal Action No. TDC-14-0554

## MEMORANDUM OPINION

Pending before the Court are two Motions to Suppress filed by Defendant Terrance Stanback. In the Motions, Stanback seeks suppression of (1) evidence seized from his person following a warrantless traffic stop on September 4, 2014; and (2) evidence seized from his home pursuant to a search warrant executed on December 3, 2014. For the reasons set forth below, both Motions are DENIED.

## PROCEDURAL HISTORY

The Motion to Suppress relating to the September 4, 2014 traffic stop is the second such motion filed by Stanback. On December 23, 2015, the Court issued a Memorandum Opinion and Order denying Stanback's first motion on this issue. *See United States v. Stanback*, No. TDC-14-0554, 2015 WL 9450822 (D. Md. Dec. 23, 2015). The underlying facts relating to the traffic stop are set forth in that Opinion, which the Court incorporates by reference here. *See id.* The Court ruled that the traffic stop was permissible because Stanback had violated Maryland traffic laws when he passed a school bus that was displaying a stop sign as it was discharging children. *See* Md. Code Ann., Transp. § 21-706(a) (West 2010). The Court further held that although the Government had failed to establish that Stanback had consented to a search of his person, Prince

George's County Police Officer Kevin Stevenson, who conducted the stop, had a reasonable basis to believe that Stanback was armed and dangerous to justify a frisk under *Terry v. Ohio*, 392 U.S. 1 (1968). This reasonable belief was based on information that Stanback was a suspect in a drug investigation and Officer Stevenson's observations, while writing the ticket from his police cruiser directly behind Stanback's vehicle, that Stanback was "moving around a lot," that he was leaning forward "as if he was going underneath the seat," and "moving to the passenger side of the vehicle and to the rear row of seats directly behind him." Sept. 10, 2015 Mot. Hearing Tr. ("Tr.") at 12, 38, 46; *Stanback*, 2015 WL 9450822, at *2. Because a small plastic bag of heroin was recovered from Stanback within the scope of a lawful *Terry* frisk, which then justified a more extensive search that revealed 110 grams of heroin in Stanback's pants, the Court denied the motion.

On April 20, 2016, Stanback, represented by new counsel, filed a Motion to Reopen the suppression hearing, arguing that predecessor counsel, who had been the subject of a Government motion seeking to disqualify counsel, was not properly prepared for the first hearing. Stanback asserted that (1) the finding that Stanback had unlawfully passed a stopped school bus should be reexamined because he had evidence that Prince George's County Public Schools has no bus stop at the identified location; and (2) the finding that Officer Stevenson observed Stanback moving around in his vehicle during the traffic stop should be reexamined because he had evidence that the tint on the rear window of the vehicle and the height of the driver's seat was such that it was impossible for Officer Stevenson to have made those observations. The Government did not oppose reopening of the matter. On June 7, 2016, the Court granted the Motion to Reopen and scheduled an evidentiary hearing for June 14, 2016.

In a separate Motion, filed after the original motions deadline but excused for the same reason that the Motion to Reopen was granted, Stanback seeks suppression of evidence recovered during a December 3, 2014 search of his home pursuant to a warrant. Stanback argues that the use of information arising from the warrantless traffic stop tainted the search warrant affidavit, and that with or without such information, the affidavit did not establish probable cause to search his home.

## DISCUSSION

### I.    Motion to Suppress (Traffic Stop)

At the evidentiary hearing on June 14, 2016, the Government offered the testimony of a bus driver for Bishop O'Connell High School, a private school located in Arlington, Virginia, who stated that she drops off children from that school every day at the exact location and approximate time that law enforcement officers observed Stanback pass a stopped school bus. The Government also offered photographs of the school bus stopped at that location. Stanback's counsel conceded that with this information, there was no longer a basis to revisit the finding that Stanback had unlawfully passed a stopped school bus.

Stanback then offered a series of photographs documenting that the rear window of his 2004 Ford Expedition has a dark tint, that the driver's seat headrest rises to within five inches of the roof of the vehicle, and that when seated, Stanback's head does not go above the top of the headrest. The photographs were taken on Piscataway Road in Clinton, Maryland, the same road on which Stanback was stopped, and the exterior photographs were taken in September 2015, at the same time of year and at approximately the same time of day as the traffic stop in September 2014. Stanback also offered the testimony of Stephen McDonald, a Registered Inspection Mechanic at Oxon Hill Shell, a service station in Oxon Hill, Maryland. McDonald testified that

3

he had measured the tint on the rear window and found that it allowed for 19 percent light transmittance, which complies with Maryland regulations for after-market tint because Maryland does not set a limit on after-market tint of the rear window of a multipurpose passenger vehicle, which would include sport utility vehicles like a Ford Expedition. *See* Md. Code Ann., Transp. § 11-136.2(1) (West 2010) (defining "multipurpose passenger vehicle" as "a motor vehicle that is designed primarily for carrying persons and which is constructed on a truck chassis or with special features for occasional off-road operations"); Md. Code Ann., Transp. § 13-937(a) (West 2010) ("When registered with the Administration, every multipurpose passenger vehicle is a Class M (multipurpose) vehicle."); Md. Code Ann., Transp. § 22-406(i)(1)(ii) (West 2010) (stating that "a person may not operate a vehicle registered under. . . § 13-937 of this article on a highway in this State if . . . there is affixed to any window to the immediate right or left of the driver any window tinting materials added after manufacture of the vehicle that do not allow a light transmittance through the window of at least 35%"). He noted, however, that the tint on Stanback's Expedition was the original factory tint and had not been altered. Stanback testified at the hearing that he had not altered the original factory tint on the Expedition.

This evidence does not provide a basis to alter the Court's prior ruling. Although Stanback has established that the rear window of his Expedition has a dark tint, the evidence does not indicate that Officer Stevenson could not have observed Stanback's movements through the window. The 19-percent tint on the rear window was factory-installed and has not been altered. Although dark, it is not opaque. Photographs from the interior of the vehicle, Exhibits S-3 and S-4, show that one can clearly see out the rear window and back-seat side windows, which have the same tint as the rear window. McDonald testified that the tint and view through those windows is the same whether from inside or outside the vehicle.

4

Although photographs taken from outside the Expedition indicate that in daytime, the view into the vehicle is not as clear as the view looking out from inside the vehicle, one of the photographs of the exterior of the Expedition, Exhibit S-7, shows that even with the tint one can see through the rear window all the way to and through the front windshield, as it depicts the vegetation in the landscape in front of the vehicle. One can also see the shape of the rear view mirror, located near the front windshield, in the photograph.[1]

It would be inappropriate to conclude that Exhibit S-7 depicts the precise view that Officer Stevenson had on the date of traffic stop. It is unknown how the position of the Expedition, the weather, and the sunlight conditions at the time the photograph was taken may differ from the conditions on the date of the traffic stop. The view in the photograph could differ from the actual appearance of the interior of the Expedition to Officer Stevenson depending on the settings used in taking the photograph. Notably, this photograph appears to have been taken from at least a car length behind the Expedition, while Officer Stevenson was presumably closer, having testified that he was only a "few feet back." Tr. at 38. But because the photograph indicates that one can see through the rear window to the front of the Expedition and discern shapes in the interior, the Court finds that the rear window was not so dark that it would necessarily preclude Officer Stevenson from observing movements by someone sitting in the driver's seat.

Likewise, the Court finds that the fact that Stanback's head does not rise above the top of the driver's seat headrest, as depicted in Exhibit S-6, did not preclude Officer Stevenson from making his observations. Although the headrest might block Stanback from view if he remained

---

[1]   Exhibit S-7 is the only photograph of the rear of the Expedition that was printed on high-quality photographic paper. The other two photographs of the rear of the Expedition, Exhibits S-1 and S-2, do not show the landscape out the front of the windshield, but they are of minimal probative value because they were printed on ordinary printer paper and are of poor resolution.

stationary, Officer Stevenson testified that he saw Stanback "moving around a lot," and that Stanback was leaning forward "as if he was going underneath the seat," and "moving to the passenger side of the vehicle and to the rear row of seats directly behind him." Tr. at 12, 38, 46. If at any point Stanback moved his head to the side, away from the headrest, he could be seen from the rear. Moreover, two photographs, Exhibits S-4 and S-5, show that there is an opening between the two front seats of the Expedition, so movement toward the front passenger seat and reaching to the rear seat area, presumably through that opening, could also be seen from the rear. These photographs thus do not provide a basis to refute Officer Stevenson's observations.

In summary, the evidence submitted at the second evidentiary hearing does not provide a basis to alter the Court's prior finding that Officer Stevenson credibly testified that he observed suspicious movements which, when coupled with his knowledge that Stanback was a suspect in a drug investigation, justified a *Terry* frisk that led to the discovery of heroin. *See Stanback*, 2015 WL 9450822, at *5–6. The Court therefore reaffirms its prior ruling and denies the second Motion to Suppress relating to the traffic stop. The Court need not and will not address the Government's alternative arguments to justify the search and seizure.

## II.    Motion to Suppress (Search Warrant)

In Stanback's Motion to Suppress relating to the search warrant, Stanback seeks suppression of evidence seized from his home pursuant to a search warrant signed by Chief United States Magistrate Judge William Connelly on November 26, 2014. Upon a challenge to a search conducted pursuant to a warrant, the Court's task is to determine, from the information contained within the "four corners" of the affidavit, and any additional information "actually presented to the magistrate judge during the warrant application process," whether there were sufficient facts to establish probable cause to conduct the search. *See Owens ex rel. Owens v.*

*Lott*, 372 F.3d 267, 277–78 (4th Cir. 2004). Probable cause exists if there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In reviewing the warrant, courts afford "great deference" to the magistrate judge and review only to determine whether the issuing magistrate judge had a "substantial basis" for finding probable cause." *Id.*; *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990).

### A.     The Search Warrant Affidavit

The affidavit in support of the search warrant contained a significant volume of information, much of which derived from wiretaps, establishing the existence of a conspiracy to distribute heroin and probable cause to believe that Stanback's co-defendant, Olden Minnick, was a member of that conspiracy. The evidence in the affidavit specifically relating to Stanback included the following facts.

In late August 2014, wiretap recordings informed agents that Minnick was planning a trip to Las Vegas. A reliable informant had told law enforcement that Minnick had traveled to Las Vegas two years before to obtain a supply of drugs. While he was out of town, when GPS data indicated that Minnick's phone was likely in Las Vegas, Minnick called Stanback on August 29, 2014 and told him "When I hit you, just come on through." Aff. ¶ 39. GPS data on Minnick's cell phone indicated that he returned to the Washington, D.C. area on August 31. On September 4, 2014, Minnick and Stanback spoke by telephone and Minnick said, "I wanted to pay for the job you did for me." Aff. ¶ 42. Based on his training and experience, the affiant averred that these two statements were indicative of an upcoming drug transaction.

In the same conversation, Minnick then arranged for Stanback to meet him at Minnick's house at 3:30 p.m. Law enforcement officers conducting surveillance and saw Stanback arrive at

Minnick's house, go inside, and get back into his car. During the traffic stop that followed, *see supra* part I.A; *Stanback*, 2015 WL 9450822, at *1–2, officers recovered 110 grams of heroin, most from inside his pants. Stanback was arrested and later released.

On September 10, 2014, after Stanback had been released, a GPS tracking device on Minnick's Jeep indicated that the vehicle had traveled to Stanback's house. The GPS tracking device indicated that the Jeep traveled to Stanback's house again on November 15, 2014, one day after Minnick was observed in what appeared to be a hand-to-hand drug transaction in which Minnick received a white bag through his car window.

**B.      Probable Cause**

Taken together, these facts are sufficient to establish probable cause that evidence of a crime would be found at Stanback's residence. The 110 grams of heroin seized from Stanback's person after he had visited Minnick's house on September 4, 2014 plainly establishes probable cause to believe that Stanback was involved in a conspiracy to distribute heroin. Stanback argues that his arrest at a location away from his house did not justify a search of the home. The United States Court of Appeals for the Fourth Circuit, however, has stated that warrants to search suspects' residences can be upheld "on the basis of (1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes." *United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008); *see also United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (although finding that a seizure of drugs from an individual was not sufficient to establish probable cause to search that person's residence, noting that probable cause may exist if the person from whom the drugs were seized was someone known to be a drug dealer).

8

Here, Stanback, after leaving the home of an individual about whom there was significant wiretap evidence of drug dealing, was arrested with a significant quantity of heroin, 110 grams, indicating that he is not merely a drug user but was likely involved in distribution. The affiant stated that, in his training and experience, drug dealers often store drugs and other items relating to the drug trade in their homes. *See Williams*, 548 F.3d at 320 (considering such training-and-experience assertions in probable cause analysis). In addition, the affidavit stated that Minnick's vehicle visited Stanback's residence on two other occasions, including on November 15, 2014, one day after Minnick was observed receiving a bag as part of what appeared to be a drug transaction. Taken together, these facts are sufficient to establish probable cause to believe that evidence of a drug crime would be found at Stanback's house. *See id.* at 319.

Stanback also argues that the evidence was too stale because the seizure of heroin occurred in September, but the warrant issued in November. "A valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *United States v. McCall*, 740 F.2d 1331, 1335–36 (4th Cir. 1984) (internal quotation marks omitted). In assessing staleness, the court considers "all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." *Id.* at 1336. Evidence supporting probable cause is less likely to be deemed stale if there are indications that the criminal activity remains ongoing. *See id.* Here, the warrant was issued almost three months after the heroin was seized from Stanback on September 4, 2014, and there were no further incidents directly implicating Stanback. Without more, staleness could be a legitimate concern. However, the affidavit indicated that between September and November 2014, the drug conspiracy remained ongoing, Minnick remained actively involved in it, and he visited

Stanback's house on at least two occasions during that time frame. In particular, there was surveillance evidence that Minnick was involved in what appeared to be a hand-to-hand drug transaction on November 14, 2014, and that Minnick's Jeep was tracked to Stanback's house the next day, only 11 days before the warrant was issued on November 26, 2014. With this additional evidence, the Court deems the temporal proximity sufficient to refute the claim of staleness and support a finding of probable cause to search Stanback's residence as of the date of the warrant.

Finally, Stanback claims that the evidence should be suppressed because the warrant was so broad as to be an impermissible "general warrant." The Fourth Amendment "protects against general warrants that authorize 'exploratory rummaging in a person's belongings . . . by requiring a particular description of the things to be seized.'" *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010) (quoting *Andreson v. Maryland*, 427 U.S. 463, 480 (1976)). A warrant satisfies the requirement of particularity, and thus is not a general warrant, "when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer in executing the warrant." *Id.* at 519. Here, the warrant limited the search to a detailed list of items relating to two federal drug offenses, 21 U.S.C. § 841 (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), including controlled substances and items relating to drug distribution, packaging, payments, and other frequently related items, such as firearms. The warrant admittedly covered many types of items and would necessitate a search of all or most of the premises because some items, such as drugs, records relating to drug dealing, and drug proceeds could be hidden in very small areas. But items could only be seized if they in some way related to those offenses. *Cf.*

*Williams*, 592 F.3d at 520 (noting that even though the authorized search necessarily required review of "a large collection of items," the warrant limited the search and seizure of material on computer systems and digital storage media to information relating to specific state law offenses of harassment by computer or threats against others). The paperwork, photographs, and jewelry seized during the search met that requirement, either as evidence of drug dealing or likely proceeds of drug dealing. The Court therefore rejects the argument that this was a general warrant.

### C.    Good Faith Exception

Even if the affidavit did not establish probable cause, the search is properly upheld under the "good faith" exception articulated in *United States v. Leon*, 468 U.S. 897 (1984). The good faith exception provides that "evidence obtained from an invalidated search warrant will be suppressed only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993). Thus, this exception does not apply if (1) the magistrate judge was "misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth"; (2) the magistrate judge "wholly abandoned" the judicial role; (3) the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient" that the executing officers cannot presume it to be valid. *Leon*, 468 U.S. at 923; *United States v. DeQuasie*, 373 F.3d 509, 519-20 (4th Cir. 2004). Here, there is no evidence that the magistrate judge was misled by information that the affiant knew or should have known to be false,[2] or that he was not a neutral magistrate judge. The affidavit was not so

_____

[2]    To the extent that Stanback has argued that a wiretapped conversation on August 17, 2014 between Minnick and Stanback demonstrates that his purpose in visiting Minnick on September

lacking in indicia of probable cause that a reasonably well-trained officer should have known the search was illegal despite the magistrate judge's issuance of the warrant. *Leon*, 996 F.2d at 923. And beyond the general warrant argument, Stanback does not contend that the warrant itself was facially deficient. The Court therefore finds that even if the facts in the affidavit were deemed insufficient to establish probable cause, the good faith exception would apply, and the evidence seized during the search would not be suppressed.

## CONCLUSION

For the foregoing reasons, the Motion to Suppress relating to the traffic stop, ECF No. 76, and the Motion to Suppress relating to the search warrant, ECF No. 176, are DENIED. A separate Order shall issue.

Date: June 21, 2016

THEODORE D. CHUANG
United States District Judge

---

4, 2014 was to get paid for plumbing work he performed, the Court's review of that recording, without the benefit of a transcript, did not reveal a basis to conclude that the affidavit contained information that was false or known to be false.

12