## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

OLDEN MINNICK,

      Defendant.

Criminal Action No. TDC-14-0554

### MEMORANDUM OPINION

On August 16, 2016, Defendant Olden Minnick was convicted after a jury trial of Conspiracy to Distribute and Possess with Intent to Distribute One Kilogram or More of Heroin, in violation of 21 U.S.C. § 846 (Count One); Use of a Communications Device to Facilitate Narcotics Trafficking, in violation of 21 U.S.C. § 843(b) (Counts Two, Three, and Six); Possession with Intent to Distribute 100 Grams or More of Heroin and Marijuana, in violation of 21 U.S.C. § 841(a)(1) (Counts Four and Seven); and Maintaining Drug-Involved Premises, in violation of 21 U.S.C. § 856(a)(1) (Counts Eight and Nine).  On September 16, 2016, Minnick filed a Motion for Judgment of Acquittal and a New Trial, ECF No. 310, seeking judgment of acquittal based on insufficient evidence to support convictions on Counts Three and Four and a new trial based on alleged errors relating to expert testimony regarding drug language, the admission of evidence under Federal Rule of Evidence 404(b) of a conversation relating to cocaine distribution, and the failure to disclose portions of interview reports relating to a trial witness.  For the reasons set forth below, the Motion is DENIED.

## DISCUSSION

### I.   Motion for Judgment of Acquittal

Minnick seeks judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) on Counts Three and Four of the Superseding Indictment.  Count Three charged Minnick with Use of a Communications Device to Facilitate Narcotics Trafficking on June 11, 2014, in violation of 21 U.S.C. § 843(b); Count Four charged him with Possession with Intent to Distribute Heroin on June 11, 2014, in violation of 21 U.S.C. § 841(a)(1).  These counts relate to the sale of 100 grams of heroin by co-conspirator Christian Byrd to a confidential source ("CS") near a Shoe City store in Laurel, Maryland.

### A.   Legal Standards

In reviewing a Motion for Judgment of Acquittal under Rule 29, the Court determines whether, viewing the evidence in the light most favorable to the prosecution, there was substantial evidence to support the jury's verdict. *United States v. Osborne*, 514 F.3d 377, 385 (4th Cir. 2008).  Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.*  To sustain the verdict, the Court must conclude that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Madrigal-Valadez*, 561 F.3d 370, 374 (4th Cir. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  In doing so, the Court must consider both circumstantial and direct evidence. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982).  The Court does not weigh the credibility of witnesses, but instead must assume that the jury has resolved all contradictions in the Government's favor, *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390,

1402 (4th Cir. 1993), and give the Government "the benefit of all reasonable inferences from the facts proven to those sought to be established," *Tresvant*, 677 F.2d at 1021.

In order to sustain a conviction of Minnick on Count Three, the evidence must establish that: (1) the defendant used a communications facility such as a telephone; (2) he used the communications device to facilitate the commission of a drug felony; and (3) he did so knowingly and intentionally. *See* 21 U.S.C. § 843(b) (2012); *United States v. Johnstone*, 856 F.2d 539, 542 (3d Cir. 1988); *see also United States v. Smith*, 429 F. App'x 237, 239 (4th Cir. 2011).

In order to support a conviction on Count Four, the evidence had to establish that Minnick (1) possessed heroin; (2) did so knowingly; and (3) did so with the intent to distribute. *See United States v. Penniegraft*, 641 F.3d 566, 572 (4th Cir. 2011).

### B.    Sufficiency of the Evidence

There is no dispute that Byrd and the CS spoke about a heroin transaction on June 9, 2014, that Byrd and Minnick spoke by telephone on June 10, 2014 and then again on June 11, 2014 at 11:58 a.m., that Byrd drove to Minnick's residence on Hillantrae Drive in Clinton, Maryland on June 11 and arrived at approximately 2:30 p.m., and that Byrd sold 100 grams of heroin to the CS at approximately 5:00 p.m. that day. The Government conducted surveillance that tracked Byrd to Minnick's residence and also saw him meet with the CS to complete the sale. Under the Government's theory, the June 11 telephone call was for the purpose of arranging for Byrd to pick up heroin from Minnick's home, and Byrd's trip to Minnick's residence was for the purpose of picking up the heroin that was sold to the CS later that day. If true, these facts would establish the elements of Count Three in that Minnick would have intentionally used a telephone to facilitate a narcotics transaction, as well as the elements of

Count Four in that he would have knowingly possessed heroin with intent to distribute immediately before supplying the drugs to Byrd.

Minnick's claim is that there was insufficient evidence for a reasonable jury to reach these conclusions because there was no recording or other direct evidence of the content of the telephone call, the surveillance at Minnick's residence did not include direct observations that Byrd actually met with Minnick or left with a package of drugs, and there was no direct evidence that the drugs sold to the CS had come from Minnick. In particular, Minnick notes that at the time of the call, the CS had not informed Byrd of the quantity of heroin to be purchased or the specific time of the sale.

Although there was no direct evidence that Byrd and Minnick discussed a drug transaction by telephone on June 11, or that Minnick distributed heroin that day, the Court finds that the circumstantial evidence was sufficient for the jury to convict Minnick on Counts Three and Four. First, there was evidence to support the inference that Minnick was engaged in heroin distribution and that he had heroin at his residence on June 11, 2014. The recorded conversations between Fred Brooks and Sean Wilson revealed that Brooks was shipping heroin to Wilson for distribution in Maryland. Based on a recording in which Wilson told Brooks that his main distributor had needed surgery for blood clots and had had his home burglarized, and separate recordings in the same time frame in which Minnick told Wilson that he needed surgery for blood clots and had had his home burglarized, it was reasonable to infer that Minnick was Wilson's main heroin distributor. According to the expert testimony of Officer Brian Shutt of the Baltimore City Police Department, a recorded conversation between Wilson and Minnick on June 5, 2014 indicated that they were discussing Minnick's need for more heroin to sell and that Wilson would have to come to Minnick. That same day, surveillance tracked Wilson's vehicle

4

to one of his drug stash houses, then to Minnick's residence, where Prince George's County Police Detective Terrell Brooks observed Minnick meet the driver in the garage at approximately 4:00 p.m. and talk for 10 to 15 minutes. The two men then disappeared from view, but Wilson's vehicle remained at Minnick's residence until at least 5:50 p.m. The jury could reasonably infer that this visit related to heroin distribution.

Second, there was evidence to support the conclusion that Minnick used Byrd as a distributor of heroin. The sale to the CS establishes that Byrd was engaged in the sale of heroin in June 2014. According to telephone records, between March 2, 2014 and July 31, 2014, Minnick and Byrd engaged in 518 telephone contacts, which averages out to over 100 per month or over three per day. Later recorded conversations indicate that the relationship leading to such an extraordinary volume of calls related to drug distribution. On August 20, 2014, Minnick spoke to another associate, Irvin Kenny, who told Minnick that he had "utility bills" to take to Minnick or "Lucy," Minnick's wife. Tr. Ex. TTD-145a. According to the expert testimony of Investigator Thomas Eveler, "utility bills" is slang for drug payments. The same evening, at 7:21 p.m, Kenny spoke to Byrd and said that his "client" had called about "the utility bills," and that he was checking on Byrd before he took them over. Tr. Ex. TTF-1412a. Byrd indicated that he was getting ready to "ride down" as well. *Id.* Then at approximately 8:32 p.m., Minnick and Kenny spoke again by telephone and indicated that they were trying to meet up somewhere near a Denny's restaurant. From this sequence of events, the jury could reasonably infer that Kenny was checking to see if Byrd had any drug payments for Minnick that Kenny could deliver that evening, which would indicate that Byrd was a drug distributor for Minnick.

With this evidence indicating that Minnick was involved in heroin distribution and recently obtained heroin from Wilson, and that Minnick used Byrd as a drug distributor, the jury

5

could reasonably conclude that the telephone call on June 11, 2014 related to the heroin transaction that Byrd was setting up with the CS, and that Byrd's visit to Minnick that afternoon was to pick up the heroin for that transaction. Such a sequence of events would have been consistent with Minnick's mode of drug distribution as reflected in a later exchange of drugs on September 4, 2014. On that date, Minnick and co-conspirator Terrance Stanback spoke by telephone in a recorded conversation. Special Agent David Buckel of the Drug Enforcement Administration ("DEA"), testifying as an expert witness on drug language, stated that the conversation related to setting up a time for Stanback to come to Minnick's house to obtain drugs. Later that day, Stanback went to Minnick's house and walked away with 100 grams of heroin secreted in his pants that were recovered after a traffic stop and search of Stanback. Thus, although the call between Byrd and Minnick on June 11 was not recorded, and Byrd was not stopped and searched for drugs as Stanback was, the fact that the sequence of events on June 11 was consistent with the sequence on September 4 further supports the conclusion that Byrd's call and visit to Minnick were for the purpose of acquiring the heroin sold to the CS. Accordingly, even though the evidence relating to the activities on June 11, 2014 is circumstantial, when the Court views it in the light most favorable to the Government, it concludes that there was sufficient evidence to support convictions on both Counts Three and Four.

## II.    Motion for a New Trial

Minnick also seeks a new trial based on three alleged errors. First, he asserts that the expert testimony of Officer Shutt and SA Buckel interpreting drug-related language in wiretapped calls was improperly commingled with factual testimony. Second, he claims that the Court improperly admitted as evidence a recorded conversation in which Minnick engaged in discussion using language associated with cocaine distribution. Third, he argues that the

Government improperly withheld portions of DEA investigative reports relating to a trial witness that may have contained exculpatory material.

### A.    Legal Standard

Under Federal Rule of Criminal Procedure 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).   The remedy of a new trial is to be granted "sparingly." *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1985).   In considering such a motion, the court must "balance the alleged errors against the record as a whole and evaluate the fairness of the trial." *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir. 1988).   "[A]ny error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004) (quoting 3 Charles Alan Wright et al., Federal Practice & Procedure § 556 (3d ed. 2004)).

### B.    Expert Testimony on Drug Language

First, Minnick seeks a new trial based on his claim that the testimony of Officer Shutt and SA Buckel improperly commingled expert and fact testimony so as to confuse the jury.   Both witnesses testified at trial as expert witnesses on drug language and interpreted conversations captured by wiretaps.   The United States Court of Appeals for the Fourth Circuit has upheld the use of such experts with methodologies similar to those employed by these witnesses. *See United States v. Garcia*, 752 F.3d 382, 391 (4th Cir. 2014); *United States v. Baptiste*, 596 F.3d 214, 223 (4th Cir. 2010); *United States v. Wilson*, 484 F.3d 267, 275-76 (4th Cir. 2007).   Both Officer Shutt and SA Buckel separately testified as fact witnesses regarding specific investigative activities they undertook relating to the charged drug conspiracy.

7

The Fourth Circuit has stated that "individuals who testify as expert and fact witnesses can cause jury confusion, and such a manner of proceeding is only acceptable where the district court took adequate steps to make certain that the witness's dual role did not prejudice or confuse the jury." *Garcia*, 752 F.3d at 392 (internal quotation marks and alterations omitted). In order to avoid such confusion, the district court should employ safeguards, which may include "requiring the witness to testify at different times, in each capacity; giving a cautionary instruction to the jury regarding the basis of the testimony; allowing for cross-examination by defense counsel; establishing a proper foundation for the expertise; or having counsel ground the question in either fact or expertise while asking the question." *Id.*

Here, the Court implemented each of the applicable safeguards. The Court required the Government to separate the witnesses' expert and fact testimony by calling the witnesses to the stand for distinct sessions: one to provide expert testimony and others to provide fact testimony. Specifically, Officer Shutt testified as an expert witness to interpret telephone calls on July 20, 2016, was followed by three other witnesses, then appeared again on July 21, 2016 to testify as a fact witness regarding surveillance and arrests he conducted at a residence associated with Sean Wilson. After six other witnesses testified, on July 22, 2016 Officer Shutt testified again as a fact witness, this time about GPS ping data.

On July 21, 2016, SA Buckel testified as a fact witness about overseeing a controlled buy of drugs from Christian Byrd. On July 28, 2016, SA Buckel testified again as a fact witness to authenticate voices on recordings and to state that a GPS tracking device had been installed on Byrd's vehicle. Then, on July 29, 2016, after six intervening witnesses, SA Buckel testified as an expert witness to interpret a wiretapped phone call between Minnick and Terrance Stanback.

After four intervening witnesses, SA Buckel returned to the stand to testify as a fact witness about surveillance he conducted on Minnick's vehicle in Arlington, Virginia.

The jury was also explicitly advised of the distinction in the witnesses' testimony. Prior to Officer Shutt's first testimony session as a fact witness, the Court specifically instructed the jury that he was no longer testifying as an expert witness and was testifying only as a fact witness. When SA Buckel took the stand on July 29 as an expert witness and was qualified as such a witness, the Court specifically instructed the jury that although SA Buckel had previously testified as a fact witness, his testimony on the present occasion would be as an expert witness to interpret conversations. When SA Buckel returned as a fact witness later that day, the Government started its examination by asking SA Buckel to confirm that his testimony during that session would be as a fact witness. Moreover, a review of the witnesses' testimony indicates that the Government established a proper foundation for their expertise, and defense counsel was afforded ample opportunity to cross examine the witnesses regarding their expertise and the basis for their testimony. With these safeguards, particularly the separate sessions for expert and fact testimony and advisements to the jury as to the nature of the sessions, there is no basis to conclude that there was jury confusion.

Minnick nevertheless argues that during the expert testimony sessions, Officer Shutt and SA Buckel inappropriately based their opinions on factual knowledge obtained during the investigation and interspersed fact testimony within their expert testimony. Having observed the testimony and reviewed the transcripts, the Court disagrees. Officer Shutt's expert testimony consisted of testimony about his background to establish his expertise, a description of the methodology he used to interpret wiretapped conversations, and his interpretations of certain portions of recordings as relating to drug distribution. The opinions he offered did not derive

from factual knowledge he obtained during the investigation. Notably, Minnick has identified no specific objectionable statements.

There were limited aspects of Officer Shutt's direct testimony that arguably fell outside of expert testimony. At the outset of his testimony, before he testified about his qualifications as an expert, Officer Shutt authenticated the voices on the wiretapped recordings, which was based on his factual knowledge derived from the investigation. During the remainder of his direct examination, the Government played or presented a limited number of phone calls and text messages without any comment by the witness except, in some instances, the general opinion that the calls contained no drug-related discussions, apparently to provide context for the allegedly drug-related calls. These aspects of his testimony were not of the sort that would create prejudice or jury confusion. In *Garcia*, "there were repeated instances" of the witness "moving back and forth between expert and fact testimony, with no distinction in the Government's questioning or in [the agent's] answers," and there were "multiple occasions" where the Government elicited "information garnered from [the agent's] participation in the investigation, having nothing to do with her ostensible decoding expertise." *Garcia*, 752 F.3d at 393. Here, where the authentication of voices occurred at the outset of Officer Shutt's testimony, before any discussion of his qualifications or expertise, and the only testimony he offered about calls he did not specifically interpret was effectively an expert opinion that they were not drug-related, the Government did not impermissibly commingle fact and expert testimony as in *Garcia*.

On cross examination, defense counsel, in order to challenge aspects of the expert opinions, at times elicited from Officer Shutt testimony that was likely based on his knowledge of the investigation, such as by asking whether a particular witness was a drug source for Sean

10

Wilson, when Minnick entered the hospital, whether a particular individual collected drug money for Sean Wilson, and whether there was a drug seizure immediately after a June 5, 2014 phone call. In two instances, Officer Shutt was asked about language that arguably might have been drug-related, specifically, references to "tickets" and "lawn mower," and he testified that he did not believe that those terms as used in the calls were drug-related based on information he learned through the investigation. However, he did not offer opinions about those terms on direct examination.

In *Garcia*, the Court's criticism was focused on the Government's elicitation of interpretations based on factual knowledge that appeared to have been grounded in expertise. *Id.* at 392-93; *see also Baptiste*, 596 F.3d at 225. Here, the factual information elicited on cross examination was limited and did not form the basis for the opinions that Officer Shutt offered on direct examination. To the extent that defense counsel elicited such factual testimony, he cannot now benefit from what is a form of invited error. *See United States v. Neal*, 78 F.3d 901, 904 (4th Cir. 1996) (finding that a defendant invited error where the statements challenged on appeal were "elicited by his own attorney from a government witness during cross-examination"); *see also Joseph v. Angelone*, 184 F.3d 320, 329 (4th Cir. 1999) (characterizing an alleged inadmissible statement elicited by the defendant's own attorney on cross examination of a government witness as "invited error").

As for SA Buckel, his direct examination as an expert witness was focused entirely on his qualifications, methodology, and interpretation of a wiretapped phone call between Minnick and Stanback. On cross examination, defense counsel referred SA Buckel to other phone calls, arguably relating to a plumbing issue at Minnick's home and a cookout, to determine whether information in those calls would change his opinion. As with Officer Shutt, defense counsel also

challenged SA Buckel's opinions by asking about factual information relating to the investigation, such as whether there was surveillance on Stanback at a certain time that would rule out whether he had gone to Minnick's home to do plumbing work.  Where the Government did not elicit any interpretations of conversations based on facts derived from the investigation, and the only factual testimony provided was limited and elicited on cross examination, the Court finds that the expert testimony of SA Buckel, like that of Officer Shutt, did not create the kind of prejudice or jury confusion that would warrant a new trial under *Garcia*.

In his reply memorandum, Minnick asserts for the first time that the expert testimony interpreting phone calls was impermissible because there was insufficient foundation for their opinions.  Although the Court does not ordinarily consider arguments raised for the first time on reply, the Court has reviewed the testimony and concludes that the opinions offered were sufficiently grounded in the witnesses' expertise and methodology.  The Court therefore finds no basis to grant a new trial arising from the expert testimony of Officer Shutt and SA Buckel.

### C.    Rule 404(b) Evidence

Minnick also seeks a new trial based on the admission of a recorded telephone conversation on September 14, 2014 in which Minnick was heard speaking to someone present in the room with Minnick using language associated with drug dealing.  Specifically, Minnick and the unknown male individual ("UM") stated:

| | |
|---|---|
| Minnick: | What um, what are you selling . . . deuce, quarters, and halves? |
| UM: | I'll find out, but right now like on the hard I'm doing twelve-fifty an ounce to people but that's what I be doing to them but when I front for this little guy . . . fifteen hundred. |
| Minnick: | Okay. |
| UM: | So, I'll find out. |

Minnick:      Yeah, let's see what he got, this is soft cause I might have a little,
              little nigga that got somebody.

Tr. Ex. TTD-816 at 2. The Government argued that the terms "deuce, quarters, and halves" were

drug slang for quantities of cocaine, and that "hard" and "soft" referred to crack cocaine and

powder cocaine, respectively. Minnick argues that the evidence was not relevant to the charged

conspiracy because the indictment referenced heroin or marijuana, not cocaine, and that the

evidence was therefore inadmissible propensity evidence.

This evidence was the subject of a motion *in limine*, which the Court denied on the record

on July 28, 2016. In admitting the evidence, the Court rejected the Government's argument that

the conversation was intrinsic to the charged conspiracy, but ruled that it was admissible under

Federal Rule of Evidence 404(b) as probative of Minnick's knowledge of coded language

relating to drugs and his intent to engage in drug trafficking. Unlike in *United States v. Lamarr*,

75 F.3d 964, 968-69 (4th Cir. 1996), cited by Minnick, there was no excessive questioning by the

prosecution about this conversation.

No new trial is warranted because the evidence was properly admitted. Because the

conversation related to cocaine and occurred in a discrete conversation unrelated to heroin or

marijuana distribution, it was not necessary to complete the story of the crime and therefore was

not intrinsic to the charged offense. *See United States v. Brugman*, 655 F. 2d 540, 544 (4th Cir.

1981) (distinguishing between discussions in which references to other drugs occurred during a

cocaine transaction and a freestanding discussion about marijuana that was not intrinsic to a

cocaine distribution charge). However, it was admissible under Rule 404(b) as evidence of other

crimes, wrongs, or acts.

Rule 404(b) permits the admission of other acts of the defendant if they are offered for a

purpose other than character, such as "motive, opportunity, intent, preparation, plan, knowledge,

identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). To be admissible under Rule 404(b), the evidence must (1) be relevant to one of these issues; (2) be necessary in that it is probative of an essential claim or an element of the offense; (3) be reliable; and (4) have probative value that is not substantially outweighed by confusion or unfair prejudice. *United States v. McBride*, 676 F.3d 385, 396 (4th Cir. 2012). On the issue of relevance to the charged offense, "[t]he more closely that the prior act is related to the charged conduct in time, pattern, or state of mind, the greater the potential relevance of the prior act." *Id.* at 397. In *United States v. Cabrera-Beltran*, 660 F.3d 742 (4th Cir. 2011), the Court held that "evidence of a defendant's prior, similar drug transactions is generally admissible under Rule 404(b) as evidence of the defendant's knowledge and intent." *Id.* at 755. Although this conversation related to cocaine, the particular drug involved in the prior act does not necessarily have to be the same as the drug at issue on the charged offense for the evidence to be admissible under Rule 404(b). *See United States v. King*, 768 F.2d 586, 588 (4th Cir. 1985) (holding that evidence of prior cocaine convictions was admissible under Rule 404(b) to show intent and absence of mistake in a prosecution for possession with intent to distribute PCP); *McBride*, 676 F.3d at 397 (noting that a "difference in the type of narcotic, standing alone, would not merit exclusion of the evidence" under Rule 404(b)); *see also United States v. Waldron*, 389 F. App'x 283, 286-87 (4th Cir. 2010) (upholding admission of prior conviction for possession of cocaine under Rule 404(b) in trial for conspiracy to distribute marijuana); *United States v. Simmons*, 34 F.3d 1067, at *4 (4th Cir. Sept. 1, 1994) (unpublished) (holding that in a prosecution for possession with intent to distribute crack cocaine, evidence of packages of marijuana found in the defendant's vehicle was admissible to show knowledge and intent).

Here, the Government's case centered on recorded conversations in which Minnick and others used language that the Government argued constituted coded language relating to drug dealing. The defense countered, through expert testimony, that the language used was typical of ordinary conversation among individuals from a particular community or social circle. In the context of this case, therefore, the conversation in question was relevant to establish that Minnick had knowledge of drug slang and coded language and that when he used such language, he had the intent to engage in drug dealing. It was particularly probative because it occurred in September 2014, within the period of the charged conspiracy, and was captured on the same telephone that Minnick had used for other conversations in which he allegedly used coded language to discuss drug dealing. *See United States v. Johnson*, 617 F.3d 286, 297 (4th Cir. 2010) (noting the importance of a close relationship of the prior act in "time, pattern, or state of mind" to the charged offense to justify admission under Rule 404(b)). Moreover, the drug slang used in this background conversation inadvertently captured on the telephone was more explicit than most of the language used in the other recorded conversations, when Minnick may have been more careful about his choice of words. It was therefore necessary and non-cumulative evidence on the issue of Minnick's knowledge of drug terminology and his intent when using such language to engage in drug dealing rather than innocent activity. The evidence was plainly reliable because it consisted of a recording of Minnick in conversation with another person. Finally, the probative value was not outweighed by the danger of unfair prejudice and confusion, because it was no more inflammatory than other phone conversations purported to relate to drug distribution, and there was no evidence that the conversation actually resulted in a drug transaction. Because the evidence was properly admitted, there is no basis for a new trial.

### D.    Witness Interview Reports

Finally, Minnick seeks a new trial based on the withholding of certain redacted portions of interview reports relating to a testifying cooperating witness.  In its Memorandum Order on Minnick's Motion for Post Trial Discovery, ECF No. 320, the Court addressed the limitations of Minnick's theory that those reports would contain exculpatory material.  Out of an abundance of caution, the Court ordered those reports filed with the Court for *in camera* review.  Having received and reviewed the previously withheld text, which largely consisted of information relating to drug distribution activities outside Maryland and other matters unrelated to the charged crimes, the Court concludes that the reports do not contain any exculpatory material. Accordingly, there is no basis for a new trial relating to the interview reports.  The Court also denies the remaining request in the Motion for Post Trial Discovery for disclosure of those materials to defense counsel.

### CONCLUSION

For the foregoing reasons, the Motion for Judgment of Acquittal and a New Trial, ECF No. 310, is DENIED.  The Motion for Post Trial Discovery, ECF No. 304, is DENIED as to the request for disclosure of the unredacted interview reports.  A separate Order shall issue.


Date:  December 5, 2016

THEODORE D. CHUANG
United States District Judge